In light of that, we will call our next case, In-Rae O'Rourke-Foods. We shall see. If you'll wait just a minute, Counselor, we've got a late arriving. All right, Counselor, if you're ready to proceed. I am. Thank you, Judge. May it please the Court, my name is Edward Weisfelder. I'm here on behalf of the appellant R. Squared, Top Hat Limited. Your Honor, I'd like to reserve three minutes for rebuttal. That's fine. Thank you. Can I ask at the outset, Mr. Weisfelder, how much is at issue here in terms of dollars and cents? Your Honor, at the date of the confirmation or the denial of our motion for summary judgment, the amount at issue is just under $7 million, with costs that are covered under the credit agreement and interest. I haven't done a final computation, but it is a number somewhere in the $8 to $10 million range, I would expect. And the provisions of the plan would provide that you get paid in full? Yes, that's right. So the appellee's position is you've been paid in full because of the limitation and your provision. And so if we were to find for you, we would find that, in fact, you were impaired and not paid in full, and therefore the plan order would have to be vacated, the confirmation order? Your Honor, I don't necessarily think that the plan order has to be vacated. It's among the relief that could be imposed. But we note, and I think it's important, that the public filings, which this court can obviously take judicial notice of, indicates that at the time of the merger, which was a consequence of the confirmation, or Aurora was merged into Pinnacle, there was some $21 million reserved in connection with this appeal. So the fact of the matter is I think that Aurora or its successor can simply write a check. Well, but it's a plan. I mean, our order, we can't issue an order saying write a check and make everything right. Our order would have to be finding that the plan should not have been confirmed as it was because it didn't provide for a full payment to your client, and therefore the order should be vacated. Wouldn't we have to do that as a court? Your Honor, I think you can only deal with orders. Certainly. Well, I think the matter could be remanded to the bankruptcy court for an ultimate determination as to how best to resolve the issue, including without limitation a revocation of the order on condition that the amounts due to us be paid, in which case the order would be subsequently imposed. In other words, I don't think the rights of any of the other parties to the reorganization need to be impacted or affected. I know, but if there's an order that was improperly entered because you were impaired and it didn't provide for you, I mean, that's why we sent the letter out saying be prepared to address that because we vacate, we reverse, we remand, but we deal with the propriety of the action that's been taken. And, Your Honor, again, I don't want to shy away from it. In our opinion, the order confirming the plan over our best interest test objection was improper. That's what you're saying. Let me cut right to what I think is the chase. In your reply on page 6, you say, even if the catch-all language relied on by Aurora were read to concern the level of consent required for a fee reduction, and that's that prefatory language in the two amendments, any purported modification to the consent requirements of Section 10.6a would be ineffective because the modification itself was not adopted by unanimous consent. And you point to the credit agreement provision that prohibits any change in any manner absent unanimous written consent of the lenders. Isn't that at the heart of your argument? Well, certainly. I mean, the point is that the provisions that added the two fees in question, that then got reduced in October, they have to be presented as either consistent with the rest of the contract, which by the very terms of those amendments, they're going to be consistent with the rest of the contract, or they constitute some sort of amendment to the contract or some sort of change in the operative provision. Well, the operative provision that we're concerned about, and it's not unusual in any credit agreement, that among the sacrosanct items is you don't change when or how much I get in principal, when or how much I get in interest. You don't reduce. You can increase. You can certainly increase. You can add on. And you're always right, and I overspoke or misspoke. The things you can't do is you can't adversely affect when and how much I get for principal, interest, and fees. These are a lot of other things. You can increase the fee. So to the extent that the two amendments had language at the introductory phrase would have permitted a later reduction by less than unanimous vote, those phrases are annullity. Well, yes, but I'll tell you what happened. Unless they, those amendments themselves, had been agreed to by unanimous agreement, and they weren't, correct? I just want to make sure I understood. We support that reasoning. I just don't think you have to go so far as to say the language was annullity because I think you could still conform or harmonize all of the language, including that magic prefacatory language, to say that what it meant was you can still use majority, not unanimous support, to raise the fee, which, by the way, happened as a matter of fact. Between February, I'm sorry, June of 2002 and February of 2003, the new fee got raised. So you could raise it. You could change the timing of when you stress tested for the applicability of the fee, but you can't change the credit agreement fundamentally by saying, we're going to adopt the fee, which, by the way, gets put in place because the issuer was in trouble economically. We changed the risk profile for all of the lenders. We're going to accept the new risk, but in consideration for which, we're going to impose a fee. Well, once you impose a fee, you didn't impose it for the benefit of the requisite lenders. You imposed it for the benefit of all of the lenders because you changed the risk profile of the deal. You can't then, in derogation of the contract, say, well, we're now going to take away the fee that, by the way, was earned, was payable, and none of those issues are debatable. The contract by its terms says the fees were earned. The contract by its terms say that they're due and payable upon independent default, which occurred no later than the day of the filing of the bankruptcy petition. You can't then ignore 10.6.A by saying the requisite lenders as opposed to all the lenders could change the fee. And by the way, again, going back to statutory canons of contractual construction, not only do we have to make sure that all the provisions are harmonized, the other provision that you'd have to read out of this contract if you wanted to adopt Aurora's assessment of it is the provision of the contract that says, hey, by the way, if you're going to affect something by the requisite lenders as opposed to the unanimous requirement, like a fee reduction, then go ahead and do it. Just make sure you pay off all of the lenders that didn't consent. Well, we didn't consent, and we didn't get paid off. So Aurora's construction would also do injustice to that provision of the contract. Yes, Judge, I'm sorry. I didn't mean to interrupt you. Isn't it the case that your client came into this enterprise in March of 2003? Yes, I think it made its purchases between March and I guess... It was after the February 2003 amendment, correct? That's correct, Your Honor. So you knew when you came in that in February, by a non-unanimous amendment, there had been a withdrawal of an interest requirement that had been previously inserted. I think what Your Honor was referring to is the fact that in the first amendment there was a pink interest provision, and in the second amendment the pink interest provision was removed, which Aurora relied on in the courts below as somehow proving a course of conduct that you could, in fact, rely on the requisite majority to yank something away under the terms of the credit agreement. A couple of reasons why that doesn't impact our entitlement, and let me go through them one at a time. Perhaps most directly is the provision of the credit agreement, Section 10.10, which provides in clear, unambiguous language that a waiver by any lender or all the lenders of any of its rights does not constitute a waiver of any of its rights in the future. So, in other words, the fact that the lenders, taken as a group who pre-existed our involvement in the case,  with regard to the pink, because there's a question about whether or not having instituted a provision for payment in kind and then having to revoke the payment in kind in connection with other fees, you really are changing the economic deal such that you needed full lender consent. But even assuming, for the sake of your question, that you needed full lender consent, the fact that people didn't object to it isn't a waiver of my rights pursuant to the very terms of the contract. Mr. Weinfelder, you've done me a great service. You've responded to more of a question than I asked. I understand your position on the waiver, but of course your client wasn't in a position either to waive or not waive because it wasn't there. My real question was, your client presumably understood what had happened before and must have gotten the idea. Well, apparently by a non-unanimity, there can be modifications that are adverse to the lenders. Your Honor, again, I would submit that one can only speculate as to what my client thought was the implication for the fact that certain other lenders didn't complain about the removal of the pink. And again, as a matter of fact, one can take a look at the imposition of an enhanced leverage fee that was imposed the second time around in the addition of the new asset fee, which collectively could have been more, substantially more than the pink interest figure was to lay everyone to the conclusion that no one needs to complain about this because it's not an adverse economic consequence. Do we know that? Is there anything in the record? I had assumed that. There was not a fee reduction by that provision, but I just didn't. Your Honor, the answer is I don't recall that far, whether one could have done the calculations to be sure about it, but I'll tell you something else. With all due respect, I think what my client thought about the failure of other lenders to take action with regard to the pink is frankly irrelevant because all of us conceded that this is an unambiguous contract. And if it's an unambiguous contract, we give it its plain meaning without consideration of intrinsic evidence of what the course of conduct was by the parties. And the fact, and I know Aurora makes a lot of this, that no one complained about the pink interest is frankly irrelevant when one considers whether or not a provision that requires unanimous lender consent to reduce a fee can be accomplished without unanimous consent of all lenders. So in that regard, we believe that the removal of the pink feature is not relevant. Could you address equitable mootness? Why shouldn't the appeal be dismissed on that basis? It shouldn't be dismissed on that basis for a couple of reasons. First, this would be the third court that considered equitable mootness. The bankruptcy court considered it most recently in connection with the denial of the state pending appeal where, and I'm paraphrasing what the bankruptcy court said, but basically, look, I'm not a lifetime appointed judge and mine was a close call. I could see the argument going either way. And more importantly, it's a matter of the ability to effect a result that would benefit us without knocking away the underpinnings of the restructuring. The court found that our $6 million to $9 million entitlement would in no way, shape, or form threaten the restructuring or in any way put anybody off with regard to their expectations. Likewise, the district court, in considering the same issue on appeal, found that there was no equitable mootness and, as I think your honors know, went to the merits of the appeal. Unfortunately for us, came out and argued the wrong way, but did determine that there was no equitable mootness denying our opportunity to prevail in this court for an interpretation of the laws related to the contract. And I guess appellees would have to raise that in any event on appeal, and I realize that only a little too late that they have not said, and even if there's a problem, separately. I'm glad you mentioned that, or else my partner would have yelled at me. That is right, your honor. It was never raised on appeal. All right. We'll hear from you right about now. Thank you.  Good morning, your honors. My name is Sally Henry. I'm here as counsel to Pinnacle Foods, LLC, which is a successor to Aurora Foods, Inc., which was a debtor in this case. Four years ago, the bankruptcy court confirmed a plan of reorganization that included a number of disparate parts. One of the parts was reflected in a settlement among the parties that was set forth in the October 2003 amendment. The question that was raised in an objection to confirmation and rejected by both the bankruptcy court and the district court below was whether that October 2003 amendment was correctly entered into. Our square argues, as you know, that there would have had to have been a unanimity of the lenders to enter into that agreement, which was really a cornerstone of the plan of reorganization. The bankruptcy judge and the district court and the parties who had been in the agreement from the get-go all understood the agreement to operate differently and to require only that at least the majority of the lenders agree to that change, and that was for several reasons. I apologize. I have a bit of a frog in my throat, so if I take a sip, I apologize. Number one, the provision that Mr. Weisfeldman points to was part of the credit agreement at the get-go, but it didn't limit the ability to add other more specific provisions with respect to other fees. Certainly, without doubt, 10.6 relates to the fees that were in the credit agreement when it was formed in 1999. But later, in 2002, when the agreement was amended for the first time to add the extraordinary fees in connection with the work-out, there was a new set of fees. The pen interest and the excess leverage fee were added, but from the very get-go, they had an internal limitation, and that internal limitation was that they were only subject to actions of the requisite lenders, that is, at least more than 50% of the lenders who agreed. But how could that later amendment include that provision, or how could that provision in a later amendment be enforceable and appropriate when the original agreement says that if there is any change in any manner, any provision of this agreement,  that that change must be approved by all lenders? So if you were attempting, both in the June 2002 and the February 2003, to carve out some exception whereby fees could be reduced by less than all lenders, all lenders had to approve the June 2002 and February 2003 amendments, didn't they? I would think not, Your Honor, for this reason. Although the credit agreement required that all lenders agree to changes in fees that were in that credit agreement, these fees were not in that credit agreement. And if you had to have all lenders to add fees, to add extraordinary fees that were subject to being changed otherwise, which had their own internal limitation, you couldn't have added those fees either. In other words, you couldn't plus. Well, you could always add. What happened was these people decided to add, but only subject to being able to take away by the requisite lenders. But once you've added, and the main agreement provides you can't reduce fees, you can't do it with less than all the lenders. Isn't it a two-track system? I think everybody can agree. If you have the requisite lenders, hey, you want to add more fees, great. You don't need everybody to decide that. You want to take away, though, that's a different track altogether, and you need unanimity. Yes, but they never added the fees except subject to the internal limitation. My point is, if they couldn't... But then they had to have all the lenders agree to that limitation. Yes. How many people agreed to the June 2002 and February 2003 amendments? Requisite or everybody? Requisite. And so if you're saying they couldn't have agreed to it, the fees were not increased either because those fees never existed except subject to amendment by 51%. So the entire provision has to be stricken. Why? You can't say the first phrase is stricken, but the second phrase... Judge Palma asked why. Why does the entire thing have to be stricken if nobody was objecting to the increase? Because the increase was always subject to this particular limitation. The people who sat around that table trying to figure out what should be done to get Aurora out of its pickle and get it to a situation where they could pay down the loan and set deadlines for the company added this extraordinarily high fee but only with the proviso that they could pull it back. They weren't going to get it to a situation where it had to be pushed off the game plan. But if part of that agreement was that a fee once raised could then be reduced, all the lenders had to agree to that, didn't they? Didn't they all have to agree that a fee once raised, if then, is going to be reduced? Everybody had to agree that less than everybody could effectuate that, didn't they? Well, I would say that... First of all, I would disagree that 10.6 talked about the fees that were in the credit agreement in 1899. But you're not telling me that when something in the original agreement says here under, that then later amendments don't become incorporated and part of here under. That really does not ring true. I did commercial work for years and that's a dangerous concept to my mind. That's not exactly what I was saying, Your Honor. Had there been just another fee added that would apply to any other way the fee added. But these fees were different because they specifically were limited by the ability to take them away. They were so extreme, they were so high, they were putting such a gun to Aurora's head to get the bank group out of this deal that they had this self-executing limitation. The testimony, the finding of fact that Judge Walsh made at the bankruptcy court was that the people who worked on the deal understood that these fees could be taken away. Now, if what you're saying is that the fee couldn't be in there and subject to being gotten rid of by a majority of lenders, then I would say by necessity you couldn't have the fee at all. Ms. Henry. Yes, sir. Let me see if I can understand what your sense is of what the requisite lenders could do. You've told us that the June 2002 amendment and I think also the February 2003 amendment they were adopted by the requisite lenders not by unanimity, correct? That is correct. And you rely on the fact that the amendment specified except as otherwise agreed to in writing by the requisite lenders. So if there were going to be change, the requisite lenders would do it. That's correct, sir. Could the requisite lenders in June 2002 or February 2003 have provided not except as otherwise agreed to in writing by the requisite lenders but except as otherwise agreed to by 40% of the lenders? It strikes me that the thrust of your argument that you can deviate from the original agreement involves a deviation that the requisite lenders can pursue without limit. And if they want to provide for less than their own number to make further amendments, that would be permissible. It would seem like an odd way of constructing the original credit agreement. I think that is odd, but I think that's not what happened here. I didn't say it was what happened, but I wonder whether it doesn't necessarily follow if we're going to sustain the construction that you have in mind. Well, I don't think it follows because, once again, there was a provision that certain things that were in the original credit agreement could only be changed by unanimity. Other things had to be changed by the requisite lenders. So there came a time when the requisite lenders added something that hadn't been subject to the unanimity requirement in the original document, but they added it only subject to the requirement that the requisite lenders could bring it back. And you have to have it as a whole. I beg your pardon? I'm sorry. You have to have it as a whole. They would not have added it and just said, okay, we're going to add this provision, but it's subject to the unanimity requirement because then it wouldn't have been appropriate for the workout situation they were in. I understand your point, and if you should think that's the stronger point, then you have to say, by extension, that, in fact, the amendments should have no force in effect because they were invalid from the get-go. You can't pick and choose different parts of that sentence to prove to be enforceable later because it wasn't amended to give an extraordinarily high fee, $35 million, by the time they came to the last amendment without being able to pull people back from the game plank. 10.6a didn't talk about reducing extraordinary fees. It talked about a prohibition except under unanimity of decreasing, quotes, the amount of any fees payable here under. That is correct, but at the time that was entered, these extraordinary fees that were later added, only subject to their internal limitation, only subject to that special limitation, were not in there. So, yes, certainly with the first 1999 draft of the credit agreement, there's no fee that you could have gotten rid of by requisite power. But when they put in the other fee, you have to take it as it is, which is a fee that's subject to the requisite limiters, or it's not there at all. But if a fee is payable under an amendment, is it not a fee payable here under? This fee was payable under an amendment subject to the requisite limiters. So my question is, if a fee is payable because it's been added in an amendment, is it not a fee payable under the loan agreement, i.e. here under? Yes, unless it's subject to the requisite limiters. Because at that point, it has its own internal limitation. At that point, it only exists with that limitation. So you can say it's not payable at all. It was totally not appropriate. And in that case, there would have been no $15 million payment to be divided up among the lenders at the time of confirmation 40 years ago. Or you can say that it is subject to that limitation because it was something that wasn't controlled by 10.6. It's not having been in the document at the original time. Ms. Henry, would I be right? From the course of your argument, it seems to me you're depending entirely on each amendment's recital that the requisite lenders can do it. You're not really pushing, are you, the argument that there was a recognized practice? Yes, Your Honor. I think I am. The practice doesn't consist of anything except what was done with the PIK interest. Isn't that correct? Yes, but there wasn't that much to have practice with respect to. But when you turn that around and look at the New York cases that you rely on, they in general were cases of practice that went on for years, were they not? Repetitive episodes? Isn't it a little difficult to hang very much of a hat on the PIK? There were only a few things that could be done. Some of the New York cases we rely on were cases where the contracts had been enforced for years and years and years. This contract was enforced from 1999 to 2004. And there was, in that course of time, only one part of these, and there was only two, excuse me, there was only one thing to be removed in 2003. Basically what happened is there were two chances to remove these extraordinary fees, and in both of those two times the parties acted in accordance with their understanding of how the document worked. It seems to me, we rely on cases that said even when the document is unambiguous, do you look at the parties' practice? Yes, I was wondering about your reliance on those cases. What the cases were and whether their statement of the current New York law seems to me a little doubtful. You finally, at the end of the series of cases that you list on page 34, well, fifth line down from the bottom, you finally refer to Evans, which was quite a recent New York case at the Court of Appeals in 2004. That doesn't help you at all, does it? Well, I think that you have a situation where at this point... Remember what Judge Smith said in Evans? It is well settled that our role in interpreting a contract is to ascertain the intention of the parties at the time they entered into the contract. If that intent is discernible from the plain meaning of the language of the contract, there is no need to look further. It's a little hard to square with the assertion higher up on the page on 34 that you can look at practice even when the contract provisions are unambiguous. Carol, two very eminent jurists have read the contract a different way. You don't want these three eminent jurists reading it another way? I'm just saying it's ambiguous. And so at that point you have the finding of fact by the bankruptcy court who heard the evidence after a full-day hearing that the understanding of the parties was that the contract operated in this way. I'm saying, okay, we think it's not ambiguous, but given the fact that two very scholarly judges at a federal court read it in a different way and you all suggest it might be read in a different way, then it gets into the range of ambiguity. All I'm suggesting here, Ms. Henry, is that it's not a fair statement of current New York law. Not a fair statement of current New York law to say that one can look to practice where a contract provision is not ambiguous. Well, I read all of those cases and I think some cases do say it. I'm not sure that the highest court of appeals... Well, take a look at Evans, which you cited, which was decided in 2004, I think is the most recent case, and it's a New York court of appeals case, which I guess is even more authoritative than the Southern District of New York in 1999. I find that the New York state contract cases have many different principles, some that apply in one case and some in another, and different benches of the court of appeals will use different maxims to interpret contracts. Can I ask you a question? It's the one that I actually started with your adversary, and that is we as a reviewing court review and deal with orders of courts, and the order that is before us here is a confirmation order. If we think it was improperly entered because the claims were impaired and not paid in full, we would reverse or we would vacate that order, would we not? Yes. All right, thank you. Thank you very much. I only have three points I want to make on rebuttal. One goes to the point that counsel made that these fees at issue were, if you use the word new, if you use the word extraordinary, and she tried to make the point that the only fees that were given protection against anything less than unanimous consent were the fees that somehow existed at the time that the original credit agreement was formed in 1999, and frankly, I think that's a very disingenuous, inappropriate argument in the first place. Likely, there were no fees that were due and owing to the lenders in 1999. Rather, the term contemplated that if the issue got into trouble and you needed an amendment and waiver, and not coincidentally, section 10 is headed amendment and waiver, that if you sought a waiver, you were going to pay a fee. So to suggest that the word fee doesn't include new or extraordinary fees that arose after 1999, I think is the height of being disingenuous. It does say any. Well, does section 10, cost expenses, taxes, including counsel fees and expenses, I mean, there is reference here to fees, so I don't think the concept of fees was reserved exclusively for amounts exacted upon later waiver, do you think? Right, but I mean, my point is that you could have very easily said in the credit agreement if your intention was we're not going to cover stuff that gets exacted later, and you say we're not covering stuff that gets exacted later. Or you refer only to specific sections of the agreement rather than say any fees. And this is another very important point, I think, because when we focused collectively on the introductory language, the acceptors otherwise agreed upon by requisite lenders, to listen to Ms. Henry's argument, you would think that within that language, following that initial language, there was any reference to the reduction of fees. Ms. Henry's discussed her argument that, hey, listen, we added fees, but only with the caveat that we could take them away again. Well, read February and June amendments. There is no reference to a reduction of fees. This gets back to the sort of specific general argument in contract construction that was spoken about below. The argument was that this provision, the acceptors otherwise required by requisite lenders, is specific. And it has to trump the general 10.6.8, but that's nonsense, because the only provision of the contract as amended that talks about reduction of fees anywhere is 10.6.8. It's not mentioned in any of those amendments. You don't know what is subject to the requisite lender consent, except what the contract otherwise preserves for the requisite lenders, which is a lot of stuff other than reducing fees. The last point I wanted to make is Judge Pollack asked the question about whether or not you could have, as part of the pregatory language, talked about 40% of the lenders and carried the same argument. I think that's an important point. You know, these contracts are structured with certain percentage lenders, and they have been for years. You know, typically under a credit agreement or under an indenture, you can have 25% of the lenders noticing an event of default and directing the trustee to take remedies. You need requisite lenders to increase or change the deal in any way. You need all the lenders if you take anything material of economic consequence away. And to suggest that you can have requisite lenders after the fact change the economic deal is just, I think, sophistry. There was a bunch of stuff argued by my adversary that's not part of the record, and I think Your Honors ought to be aware of it, that these were extraordinary fees and not appropriate for the work out. There's nothing in the record that suggests that. This was a company that was on the verge of default, both in terms of leverage and subsequently in terms of the ability to be able to come up with asset sale proceeds, again, to reduce its leverage. These fees were imposed. They were imposed for the benefit of all of the lenders because the risk profile was being changed. Some of the lenders couldn't then decide that at the end of the case, when it appeared that the banks could get paid in full, but they wanted to leave something over for the bondholders or something over for the equity, that something less than all of the lenders could then change the deal. And by the way, it wasn't Judge Walsh below. It was Judge Walras. And again, not only was the judge reference wrong, but the record doesn't support the contention that these were somehow extraordinary fees, so that if you don't give us the benefit of our contract that says you can't reduce the fees, you have to somehow take out all the fees altogether. Well, that can't be done because there was a change in the risk profile of the deal that justified the fees in the first place. All right. Thank you, Counselor. Thank you, Judge. The case was well argued. I think we'd like to see Counsel at the bar of the court, if you would come forward, please, and we'll turn the equipment off. Counsel, this is one of those cases where, number one,